IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SUSAN E. BREDTHAUER, | ) | |
| | ) | |
| Plaintiff, | ) | **4:10CV3132** |
| | ) | |
| vs. | ) | |
| | ) | |
| GILBERT G. LUNDSTROM, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RONALD A. LAIRD, | ) | |
| | ) | |
| Plaintiff, | ) | **4:10CV3139** |
| | ) | |
| vs. | ) | |
| | ) | |
| GILBERT G. LUNDSTROM, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUSAN BARKER, | ) | |
| | ) | **8:10CV326** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SAMUEL P. BAIRD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF**
**PRINCIPAL TRUST COMPANY'S MOTION TO DISMISS**
**AND REQUEST TO TAKE JUDICIAL NOTICE**

**INTRODUCTION**

Plaintiffs, former employees of TierOne Bank ("TierOne") and participants in two

TierOne retirement plans, claim that all of the defendants breached certain fiduciary duties under

ERISA by permitting participants to invest in TierOne stock over a three and a half year period. All but one of the defendants was an officer and/or director of TierOne.  Delaware Charter Guarantee & Trust Co., d/b/a Principal Trust Company ("PTC"), is the only defendant that is and was completely unaffiliated with TierOne.

TierOne's demise is regrettable and, undoubtedly, very painful for its employees who had invested in TierOne stock.  However, PTC – the only complete outsider in this case – should not, and cannot, be held responsible for any mistakes TierOne may have made which led to its demise and the stock's loss in value.  PTC, the appointed trustee for both the TierOne ESOP and the TierOne Savings Plan, was what is known in ERISA parlance as a "directed trustee."  PTC thus acted only pursuant to and subject to the direction of other named fiduciaries in purchasing and otherwise managing the company stock held by the two retirement plans.  Indeed, the contracts between TierOne and PTC expressly stated that "The Trustee [PTC] shall have no responsibility for the management and control of the Trust Fund beyond implementation of instructions, notice, or directions received by the Trustee in accordance with this Agreement . . . ."  (PTC Directed Trust Agmts. § 13(d) (p. 8) (Exs. A & B, Evidence Index, Filing No.[1] 60.)

As a directed trustee, PTC had extremely limited fiduciary duties under ERISA with respect to the TierOne stock investments.  Plaintiffs essentially contend that PTC breached its fiduciary duties by continuing to accept directions to invest in TierOne stock.  But in the circumstances pled here, PTC had no obligation to question these directions.  Pursuant to guidance issued by the United States Department of Labor, PTC could only have a duty to question the instructions it received to purchase TierOne stock if it possessed material non-public information concerning TierOne, or if it had "clear and compelling" public information

---

[1] All Filing Nos. referenced in this Brief refer to document numbers filed in the "Lead Case" – Case No. 4:10CV3132, *Susan E. Bredthauer v. Gilbert G. Lundstrom, et al.*

demonstrating that TierOne was in fact bankrupt and that its shares were valueless.  Plaintiffs allege no facts, just unsupported conclusions, to suggest that PTC had any non-public information concerning TierOne's financial problems.  The alleged public facts concerning TierOne's decline also fall far short of demonstrating that the TierOne stock was worthless as a matter of fact prior to its being taken over by the Office of Thrift Supervision ("OTS").  Accordingly, PTC had no obligation under ERISA to question the directions it received with respect to TierOne stock, and thus PTC fully discharged its fiduciary duties by complying with the instructions it was given.  As a result, Count I – the sole claim asserted against PTC – should be dismissed with prejudice as to PTC.

## BACKGROUND

### A.   The Plans At Issue And PTC's Limited Role As Directed Trustee.

This case concerns investments in TierOne stock made by the TierOne Corporation Employee Stock Ownership Plan ("ESOP") and the TierOne Bank Savings Plan ("Savings Plan") (together, the "Plans").  Each Plan authorized TierOne to appoint a trustee (ESOP § 2.1(a) (p. 12) (Ex. C, Evidence Index, Filing No. 60); Savings Plan § 9.01 (Ex. D, Evidence Index, Filing No. 60); *see id.* § 1.02 (p. 8)), and TierOne appointed PTC as trustee of the Plans through two virtually identical "Directed Trust Agreements."  (*See* Directed Tr. Agmts. § .03 (p. 2): Exs. A & B: Evidence Index, Filing No. 60).  The Directed Trust Agreements state that PTC could only act "subject to direction or instruction by the Plan Administrator, Named Fiduciary, Investment Manager, or Member," none of whom could be the Trustee.  (*Id.* §§ .05 & .01 pp. 1-2, 3)  Consistent with PTC's limited role, the Directed Trust Agreements also provided that PTC could only "invest" fund assets "as directed by" that same group of directing parties.  (*Id.* § .05(a) (p. 3).)  The Directed Trust Agreements also make clear that PTC had no obligation to review or question any of the investment (or other) directions given it, and it had no liability

either for the actions of the directing parties or for following their directions.  (*See id.* §§ .04, .13, .14, .15(c) (pp. 3, 7-9).)

The ESOP states that it was "designed to invest primarily in Company [*i.e.,* TierOne] Stock."  (ESOP § 5.1(a) (p. 29) (Ex. C, Evidence Index, Filing No. 60).)  TierOne could also "direct" PTC "to invest funds under the Plan in" certain "other property . . . ."  (*Id.* § 5.1(b).)  The ESOP provides that the trustee's role in investing or managing the ESOP Plan's assets is limited to following "the direction of the Employer or an Investment-Manager appointed by the Employer or any agent of the Employer."  (*Id.* § 8.1(a)(1) (p. 42).)  Specifically, where the trustee [*i.e.,* PTC] is given directions "with respect to the investment of [] Plan assets, the Trustee shall have no liability with respect to the investment of such assets, but shall be responsible only to execute such investment instructions as so directed."  (*Id.* § 8.1(b); *see also id.* §§ 8.1(a)(1), 8.1(b)(1).)

The Savings Plan also permitted investments in TierOne stock.  (Savings Plan § 4.01A (p. 21) (Ex. D, Evidence Index, Filing No. 60).)  The decision whether to invest in TierOne stock, however, rested solely with the participants in the Savings Plan:  the "*Participant* shall direct the investment of Contributions allocated to his Account . . . ."  (*Id.* § 4.01 (p. 20) emphasis added.)  If a participant "fail[ed] to give timely direction" with respect to how to invest his contributions, then TierOne "shall direct the investment" (*id.*); however, "absen[t] [] an election to invest in" TierOne stock, "Participants shall be deemed to have elected to have their Accounts invested wholly in other investment options of the Investment Fund."  (*Id.* § 4.01A (p. 21).)  The Savings Plan provided that TierOne stock shall remain "available" as an investment alternative "unless the Plan is amended to disallow such available investment."  (*Id.*; *see id.* § 10.01 (p. 41) (only TierOne could amend the plan).)

4

According to the Complaint, certain unidentified "employees, officers, or directors of TierOne," which plaintiffs call the "ESOP Committee Defendants," were "responsible for directing and coordinating all activity relating to the investment and management of the ESOP assets."   (Compl., Filing No. 57, ¶¶ 107-112.)   Similarly, certain "directors and officers of TierOne" appointed by TierOne's directors, *i.e.*, the "Employee Benefit Committee Defendants," "were responsible for directing and coordinating all activity relating to the investment and management of the Savings Plan assets."  (*Id.* ¶¶ 98-99, 101-103.)

### B.    Plaintiffs' Imprudence Theory.

Plaintiffs claim that, from December 31, 2006 to the present, it was imprudent for defendants to permit participants to invest in TierOne stock.  (*Id.* ¶¶ 1, 349-350.)  Plaintiffs offer two bases for this theory:

- "Defendants knew or should have known that TierOne stock was not a suitable and appropriate investment" based on "Defendants[']" alleged knowledge of certain problems with TierOne's "internal controls," its failure to properly account for its loan losses, its increasing undercapitalization, and its "lack[]" of a "reasonable basis" for certain positive statements made about TierOne's "prospects and earnings."  (*id.*); and

- "Defendants" failed to provide "complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook." (*Id.* ¶ 351.)

### C.    Plaintiffs' Claims.

Although the Complaint contains three separate counts (all arising under ERISA), PTC is named as a defendant only in Count I.  In Count I, Plaintiff alleges that PTC (and all of the other defendants) are directly liable for their alleged breach of fiduciary duty under 29 U.S.C. §§ 1109(a) & 1132(a)(2) and/or (a)(3) (ERISA §§ 409 & 502(a)(2) and/or (a)(3)).  Plaintiffs also claim that PTC is liable for the alleged breaches by the other defendants based on:  co-fiduciary

liability; failure to remedy a known breach; knowing participation in a breach; and enabling a breach.  (*Id.* §§ 1105(a), (a)(3), (a)(1) & (a)(2) (ERISA § 405(a).)

## ARGUMENT

## I.   PLAINTIFF MUST PLEAD FACTS, AS OPPOSED TO CONCLUSIONS, TO STATE A CLAIM.

Federal Rule 8(a)(2) requires a "'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 n.3.  (2007) (*quoting* Fed. R. Civ. P. 8(a)(2)).  Plaintiffs' complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

The allegations in the complaint must also "raise a right to relief above the speculative level." *Id.* at 555-56.  In other words, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 547. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully.)

"Under *Twombly,* a court considering a motion to dismiss may begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  Although legal conclusions 'can provide the framework of a complaint, they must be supported by factual allegations.'" *Precision Indus., Inc. v. Tyson Foods, Inc.*, No. 08:09CV195, 2009 WL 4377558, at *2 (D. Neb. Nov. 25, 2009) (citations omitted).

Here, as will be shown, plaintiffs offer only conclusions, not facts, to support their claims against PTC, and the facts they do allege fall far short of stating a viable claim.  Because "the allegations . . . could not raise a claim of entitlement to relief, the complaint should be dismissed

for failure to [state] a claim under Fed.R.Civ.P. 12(b)(6)." *Id.* (citations omitted); *accord Iqbal,* 129 S. Ct. at 1950 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'").

## II.     PLAINTIFF HAS FAILED TO PLEAD FACTS ESTABLISHING THAT PTC, AS DIRECTED TRUSTEE, COULD BE LIABLE FOR FOLLOWING DIRECTIONS FROM NAMED FIDUCIARIES WITH RESPECT TO THE TIERONE STOCK.

### A.     A Directed Trustee's Only Fiduciary Duty Under ERISA Is To Follow The Proper Directions Of The Plan's Named Fiduciaries.

ERISA requires that the assets of most employee benefit plans (including the types of plans at issue here) be held in a trust by one or more trustees. 29 U.S.C. § 1103(a). The trustees must either be named in the plan document or chosen by one of the plan's "named fiduciaries," which are persons specifically designated as fiduciaries in the plan document. *Id.* §§ 1102(a)(1), 1103(a).

Section 403(a) of ERISA provides for two different types of trustees. The first type of trustee has "*exclusive* authority and discretion to manage and control the assets of the plan . . . ." 29 U.S.C. § 1103(a) (emphasis added). Trustees of this sort can make decisions about the assets of the trust without consulting any other person or entity, and as a result, have broad fiduciary duties. The second type of trustee does not have "exclusive authority and discretion," but instead can only act at the direction of one of the named fiduciaries, and thus are known as "directed trustees." A trustee is deemed not to have the "exclusive authority and discretion" with respect to plan assets, and is thus a directed trustee, to the extent that:

> the plan expressly provides that the trustee . . . [is] subject to the direction of a named fiduciary who is not a trustee, in which case the trustee[ ] shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter . . . .

7

29 U.S.C. § 1103(a)(1)).  Thus, the only fiduciary duties imposed upon a directed trustee is to follow any directions from a named fiduciary that (1) are made in accordance with the plan, and (2) are not contrary to ERISA.  *Maniace v. Commerce Bank of Kansas City, N.A.,* 40 F.3d 264, 267-68 (8th Cir. 1994).

The Department of Labor – the federal agency empowered to interpret ERISA – has issued detailed guidance with respect to the scope of a directed trustee's duties regarding the purchase and retention for an ERISA plan of company stock.  DOL Field Assistance Bulletin 2004-03 (Dec. 17, 2004) ("FAB 2004-03") (*available at* http://www.dol.gov/ebsa/regs/fab_2004-3.html).  Several courts addressing issues similar to those raised here have given FAB 2004-03 "substantial weight."  *E.g.*, *In re Delphi Corp. Sec., Derivative & ERISA Litig.,* 602 F. Supp. 2d 810, 825-27 (E.D. Mich. 2009) ("*Delphi*"); *DiFelice v. US Airways, Inc.,* 397 F. Supp. 2d 735, 751-52 n. 25 (E.D. Va. 2005); *In re WorldCom, Inc. ERISA Litig.,* 354 F. Supp. 2d 423, 446, (S.D.N.Y 2005) ("*WorldCom*").

### B.    PTC Was A Directed Trustee Of The Plans.

PTC was a directed trustee of both the ESOP and the Savings Plan.  Pursuant to authority provided by the Plans (Ex. C, Evidence Index, Filing No. 60 § 2.1(a) (p. 12); Ex. D, Evidence Index, Filing No. 60 §§ 1.02 (p. 8), 9.01 (p. 37)), TierOne appointed PTC to act as trustee by entering into two virtually identical Directed Trust Agreements.  (Exs. A & B, Evidence Index, Filing No. 60 §§ .02 & .03 (p. 2).)  The Directed Trust Agreements make clear that PTC was only empowered to act at the direction of other non-trustee fiduciaries.  Specifically, both agreements state that any powers granted to PTC are "subject to direction and instruction by the Plan Administrator, Named Fiduciary, Investment Manager, or Member," none of which can be a trustee.  (Exs. A & B §§ .01 (pp. 1-2), .05 (p. 3).)  PTC's power to "invest" the trust funds in various investments was to be exercised "as directed by" the foregoing group of fiduciaries.  (*Id.*

§ .05(a) (p. 3).)

PTC's lack of discretion with respect to investments for the Plans is further confirmed by

other portions of the Agreements, which provide that PTC:

- "is not responsible for any aspect of an Investment Manager's advice, control or management" relating to the "acqui[sition]," or "disposition] of, any assets of the Plan" (*Id.* § .04) (p. 3);

- is "not required to look into any action taken" by those charged with giving PTC directions with respect to the trust assets (*id.* §§ 04 (p. 3); .13(d) (p. 8)); and

- "may assume that the Employer, the Plan Administrator, the Investment Manager, and the Insurer are appropriately discharging their duties under the Plan Documents and this Agreement" unless expressly "notified to the contrary in writing" by "a Member in the Plan, the Employer, or a governmental agency with jurisdiction." (*Id.* § .13(c) (p. 8).)

In sum, under the Directed Trust Agreements, the "Trustee [PTC] shall have no

responsibility for the management and control of the Trust Fund beyond implementation of

instructions, notice, or directions received by the Trustee in accordance with" the Directed Trust

Agreement.  (*Id.* § .13(d) (p. 8).)  Because its sole duty was to follow the directions of other

named fiduciaries, PTC was a "directed trustee" under 29 U.S.C. § 1103(a)(1).  *See, e.g.,*

*Maniace,* 40 F.3d at 265-66, 267; *Delphi,* 602 F. Supp. 2d at 812-15, 820-24; *DiFelice,* 397 F.

Supp. 2d at 738-39, 743-46.

### C.   PTC Followed The Proper Directions Of A Named Fiduciary.

As noted above, a directed trustee like PTC fully discharges its fiduciary duties under

ERISA by following the directions of a named fiduciary, so long as the directions were

(1) "made in accordance with the terms of the plan," and  (2) "not contrary to" ERISA.  29

U.S.C. § 1103(a)(1); *Maniace*, 40 F.3d at 268.  Both criteria are satisfied here.

### 1.    **PTC Acted "In Accordance With" The Plans' Terms.**

A trustee who follows the direction of another named fiduciary acts "in accordance with" the terms of an ERISA plan "if the documents pursuant to which the plan is established and operated do not prohibit the direction."  FAB 2004-03 ("In accordance with plan terms" section). Here, not only did the Plan documents not prohibit investment in TierOne company stock, but in fact, both Plans expressly *permitted* investments in TierOne stock.  Under these circumstances, the directions that PTC executed to purchase or hold TierOne stock were in accordance with the Plan documents.

TierOne's ESOP plainly permitted the purchase and holding of TierOne stock; indeed, the ESOP provided that TierOne stock was to be the ESOP's "primar[y]" investment.  (Ex. C, Evidence Index, Filing No. 60 § 5.1(a) (p. 29); *see also id.* § 5.1(e).)  The ESOP also permitted PTC to retain those investments generally, "subject[] to the direction of the Employer or an Investment Manager appointed by the Employer or any agent of the Employer."  (*Id.* § 8.1(a)(1) (p. 42); *see id.* § 8.1(b)(1).)

The Savings Plan similarly permitted investment in TierOne stock.  (Ex. D, Evidence Index, Filing No. 60 §§ 4.01A (p. 21), 1.02 (p. 7).)  Each "Participant" in the Savings Plan was responsible for "direct[ing] the investment of Contributions allocated to his Account," and was the only one who could decide whether part of his contributions should be invested in TierOne stock.  (*Id.* §§ 4.01 (p. 20), 4.01A (p. 21).)  In sum, both the ESOP and Savings Plan expressly permitted – and thereby did not prohibit – the investment of contributions in TierOne stock.  Thus, directions given to PTC to purchase and hold TierOne stock were indisputably "made in accordance with the terms of the plans."

### 2.    The Directions To Purchase And Hold TierOne Stock Were Not Contrary To ERISA.

The directions PTC was given to invest in and retain TierOne stock also were "not contrary to" ERISA.  In light of ERISA's express provision limiting a directed trustee's fiduciary responsibilities to carrying out the instructions of the named fiduciaries, a directed trustee "does not . . . have an independent obligation to determine the prudence of every transaction."  FAB 2004-03 ("Prudence determinations" section).  As the Eighth Circuit has explained, a directed trustee is "not required to weigh the merits of an investment in [the company's] stock against all other investment options every time it was directed to purchase said stock by the [Administrative] Committee."  *Maniace*, 40 F.3d at 268.  On the contrary, as the Department of Labor has made clear, the obligation of a directed trustee to "question market transactions involving publicly-traded stock on prudence grounds is quite limited."  FAB 2004-003 ("Duty to act on non-public information" section).  The "primary" circumstance under which such a duty "could" arise is where the directed trustee "possesses material non-public information" about the stock that affects its price, such as knowledge of material misrepresentations in the company's financial statements.  *Id.*  Otherwise, the directed trustee "will rarely" – only in "limited, extraordinary circumstances" – have a duty to question a direction to purchase such stock.  *Id.* ("Duty to act on public information" section).

### a.    There Is No Allegation That PTC Had Non-Public Information.

Plaintiffs nowhere allege facts showing that PTC had any material non-public information concerning TierOne that could justify imposing any "duty to question" directions to purchase TierOne stock for the Plans.

The Complaint repeatedly alleges that all "Defendants" – phrased in the plural – possessed non-public information concerning the Company's deteriorating financial condition. Those allegations are, however, mere unsupported conclusions, not entitled to any consideration. *Iqbal,* 129 S. Ct. at 1950, 1951.  Moreover, the context of each of these allegations makes clear that the only defendants who allegedly possessed non-public information were TierOne directors and/or officers, *not* PTC.  For example, plaintiffs allege that TierOne failed primarily due to increasing loan losses, and that the extent of those losses was hidden from plaintiffs and other Plans' participants.  Although Plaintiffs conclusorily allege that "*Defendants* were well aware of [TierOne's] growing loan loss problems" (Compl., ¶ 199 (emphasis added); *see also id.* ¶ 200), the sole factual basis for this conclusion is the allegation that, "[a]t least monthly, *the Individual Defendants and others*" reviewed TierOne's loan portfolio to identify losses and assess the portfolio's collection probability.  (*Id. ¶* 199; emphasis added.)  Nowhere does the Complaint (nor could it properly) allege that PTC – a complete outsider – participated in those internal loan reviews.

Plaintiffs also allege that in 2007 "TierOne began to make increasingly questionable/shaky loans" and "made a fundamental shift in its lending practices from regional community banking towards a primary focus on high-risk real estate and construction loans in markets with which TierOne had little or no experience."  (Compl., ¶¶ 203-04.)   Although Plaintiffs assert that "*Defendants* knew" of these "poor business practices" (*id.* ¶ 205; emphasis added), the Complaint nowhere alleges that PTC knew of these practices from any inside information or that it participated in any of the decisions relating to the types of loans TierOne would make.

The same attempt to charge PTC with knowledge of actions attributable only to TierOne insiders appears in the allegation that "Defendants" were aware of TierOne's deliberate underestimation of its loan loss allowances.  (*Id.* ¶¶ 203, 205.)  The Complaint alleges that it was TierOne's "management" who evaluated the loans and "estimate[d] and establishe[d] a[] [loan loss] allowance . . . ."  (*Id.* ¶ 203 n.6.)  However, despite this factual allegation, the Complaint simply switches back to the plural term "Defendants," claiming in the very next sentence that, "[a]s such, *Defendants* regularly tracked the loan losses suffered by the Bank."  (*Id.*; emphasis added.)  The Complaint nowhere alleges any facts suggesting that PTC participated in any of those loan review and analysis sessions of TierOne's management.  Plaintiffs engage in similar sleight of hand – using the plural term "Defendants" where they plainly mean TierOne insiders – throughout the Complaint.  *See also id.* ¶¶ 254-57 (although Plaintiffs state that "Defendants" were aware of TierOne's allegedly improper accounting for loan loss reserves during 2009, the Complaint elsewhere alleges only that it was "the *Company* [that] had failed to properly account for its loan loss provision and reserves . . . ."  (emphasis added).)

Plaintiffs also improperly attempt to lump PTC into the group of "Defendants" that made misrepresentations to Plan participants, but the Complaint is devoid of any factual allegations suggesting that PTC was involved in communications with participants.  To take but one example, plaintiffs repeatedly allege that "*Defendants* positively portrayed the Company's business in their communications with Plaintiffs and the Plans' participants throughout the Class Period."  (Compl., ¶ 16 (emphasis added); *see also id.* at ¶¶ 228, 245, 249, 256, 257, 273, 351.)  Yet, these communications – all of which were filed with the Securities and Exchange Commission ("SEC") –  were prepared "[b]y and through [TierOne's] Board and employees," not PTC.  (*Id.* ¶ 30.)

For instance, plaintiffs allege that "Defendants" positive statements in a March 4, 2008 Form 8-K SEC filing about actions TierOne was taking were false and misleading because "Defendants knew or should have known that the Company was experiencing severe problems with its loan portfolio, the Bank was in desperate need of capital . . . and the Company had failed to establish and record an adequate loan loss provisions." (*Id.* ¶ 220.) The immediately prior paragraph, however, acknowledges that the pertinent statements were made by "Defendant Lundstrom," TierOne's CEO, not PTC. (*Id.* ¶ 219.) There is no allegation that PTC played any role in drafting Mr. Lundstrom's statements, much less any basis for claiming that PTC was aware of the allegedly severe loan loss and capital problems.

Similarly, plaintiffs seek to hold PTC responsible for allegedly misleading statements made in an April 2010 TierOne press release, a related Form 8-K SEC filing, and in TierOne's 2009 financial statements. Plaintiffs thus allege that a May 12, 2010 response letter by KPMG "refutes *Defendants'* statements made in the April 2010 8-K and reveals *Defendants'* attempt to actively conceal material accounting information from KPMG that impacted on the accuracy of the Company's previously reported financial statements as well as the validity of the Company's internal controls." (Compl., ¶ 299; emphasis added.) Yet, the Complaint confirms that "the *Company*" – referring to TierOne, not PTC – issued the April 25, 2010 press release, "the *Company*" filed the Form 8-K report, and "Defendant *Laphen*" (TierOne's President) signed the report. (*Id.* at ¶¶ 289-90; emphasis added.) Plaintiffs do not allege that PTC participated in any way in drafting the press release or the Form 8-K, much less in TierOne's decisions as to what financial information to provide to KPMG. (*See also id.* at ¶¶ 225-28, 237, 242, 246-49, 254-56, 268-70, 271-73, 274.)

In sum, despite plaintiffs' consistent and unfounded attempts to lump PTC together with all of the other defendants, all of whom were directors and officers of TierOne, the Complaint does not allege any *facts* showing that PTC possessed non-public information concerning TierOne. *Iqbal,* 125 S. Ct. at 1951 (holding that allegations of defendant's knowledge "are conclusory and not entitled to be assumed true."); *see In re RCN Litig.*, No. 04-5068, 2006 WL 1273834, at *5, 8, n.6 (D.N.J. Mar. 22, 2006) (conclusory allegations that trustee "knew or should have known that continued investment in RCN stock was not prudent" did not suffice where complaint lacked allegations that trustee had "actual knowledge of material non-public information").

> **b.** **Plaintiffs Cannot Allege That PTC Had Any Obligation to Decline to Follow Instructions On The Basis of Publicly-Available Information.**

Plaintiffs cannot plausibly contend that PTC had a duty, on the basis of publicly-available information, to refuse to follow instructions to purchase TierOne stock. The DOL has made clear that a directed trustee like PTC "will rarely have an obligation under ERISA to question the prudence of a direction to purchase publicly-traded securities at the market price solely on the basis of publicly-available information." *See* FAB 2004-03 ("Duty to act on public information" section). The DOL has explained that this view is grounded in sound publicly policy, because the public markets are assumed to be efficient and because both ERISA and the securities laws ensure that company fiduciaries act properly and prudently with respect to company stock. *Id.*

The only "limited, extraordinary circumstances" in which a directed trustee "may" have a duty to decline to follow directions to purchase company stock (without further inquiry) on the basis of public information is if there are "clear and compelling public indicators" "that call into

15

serious question a company's viability as a going concern." *Id.*[2]  The DOL has given examples

of the sort of publicly-available information that would trigger a duty, and those examples make

clear that only the most extreme circumstances would justify a duty on the part of a directed

trustee to question instructions.   They are (1) if the company filed for bankruptcy "under

circumstances which made it unlikely that there would be any distribution to equity–holders,"

and (2) the company "otherwise publicly stated that it was unlikely to survive the [pending]

bankruptcy proceedings in a manner that would leave current equity-holders with any value . . .

." *Id.*[3]  Put another way, the public information must reveal that a formal bankruptcy filing has

already occurred *and* demonstrate clearly that, as a result of that filing,  the "shares are worthless

as a matter of fact, and not as a matter of conjecture or investment judgment about the future."

*DiFelice,* 397 F. Supp. 2d at 752, 755-56.   It is not enough to claim that the company stock

suffered a deep drop price.  *See* FAB 2004-03 ("Duty to act on public information" section).

    This extremely stringent standard is plainly not satisfied by the allegations Plaintiffs

make here.  Although the class period starts in late 2006, none of the events that occurred prior to

2010 come anywhere close to meeting the "extraordinary" circumstances outlined above.   The

events from January 1, 2007 through the end of 2009 merely amount to financial ups and downs

– *i.e.*, the increasing number of bad loans, the attempts to ameliorate the financial difficulties, the

selling off of bad assets.   None of these events are extraordinary; on the contrary, they are

exactly the sort of events that faced most banks in this period – one of the worst financial crises

---

[2] And even if the duty is triggered, a directed trustee does not have a duty to stop purchasing immediately, but instead its duty is first to inquire of the named fiduciaries as to why they believe that the instructions are prudent and consistent with ERISA.  *See* FAB 2004-03 ("Duty to act on public information" section, which refers to following instructions "without further inquiry.")

[3] The third example involves a situation where the party giving the directions is a company insider who has been "formally charged by state or Federal regulators with financial irregularities . . . ."  *Id.* ("Duty to act on public information" section).

in American history.  Accepting these allegations as sufficient would be tantamount to faulting PTC for not foreseeing the financial crisis, and would suggest PTC was required to make that prediction solely on the basis of the declining stock price and financial difficulties.  But courts have expressly rejected that notion, making clear that "a directed trustee's knowledge that a company's 'stock price and profits were declining and that the company was undergoing a restructuring' is not sufficient to find a breach of a fiduciary duty where the trustee continued to invest plan funds in the company's stock as directed."  *WorldCom*, 354 F. Supp. 2d at 449 (citing *LaLonde v. Textrom, Inc.,* 369 F.3d 1, 7 (1st Cir. 2004)); *accord In re RCN Litig.*, 2006 WL 1273834, at *6.

Similarly, none of the events that occurred during the first half of 2010 – i.e., prior to June 2, 2010, when TierOne announced to participants that it would no longer offer TierOne stock as an investment option (and thus plan fiduciaries would have stopped submitting instructions to PTC to purchase TierOne stock) – constituted the sort of "extraordinary circumstances" required to trigger a duty on the part of PTC to question directions to purchase company stock.  The Complaint mentions three events, and none of those (either individually or collectively) could have triggered a duty on the part of PTC.

First, Plaintiffs point out that on March 30, 2010, TierOne issued a press release announcing that it had entered into a "Consent to Issuance of Prompt Corrective Action Directive" with the Office of Thrift Supervision ("OTS"), its primary regulator.  (Compl., ¶ 285.) But far from signaling in a "clear and compelling" way that TierOne was bankrupt and that its shareholders would receive nothing of value, the press release suggested almost the exact opposite.  The press release explained that the OTS Consent Decree required that TierOne would be "recapitalized by merger, sale or acquisition by another financial institution by May 31,

2010." (*Id.*)   But far from suggesting financial collapse, the fact that OTS believed that TierOne's assets could be sold to another financial institution suggested that the bank's primary regulator – who would have had access to all sorts of non-public financial data – believed that TierOne remained a viable going concern.   OTS plainly would not have required the sale of a worthless company.   And while TierOne's stock declined after the Consent was announced (*id.* ¶ 287), the stock did not lose all of its value and its share price later increased by nearly 30 percent from 32 cents to 41 cents per share.   (*See id.* ¶ 294.)   And even after the OTS's April 30, 2010 rejection of TierOne's proposed asset sale to Great Western Bank, TierOne's stock price remained more than 25 percent higher than it was after the OTS Consent was announced.   (*See id.* ¶¶ 287, 293, 294.)   *See* FAB 2004-03 ("Duty to act on public information" section) ("even a steep drop in a stock's price would not, in and of itself, indicate that a . . . direction to purchase or hold such stock is imprudent . . . ."); *cf. Summers v. State St. Bank & Trust Co.,* 453 F.3d 404, 408 (7th Cir. 2006) (trustee is not "required to act on the assumption that the market was overvaluing United").

Second, the Complaint describes a dispute between KPMG and TierOne, which resulted in KPMG resigning as TierOne's auditor, and which was announced to the public in an April 25, 2010 press release.   (Compl., ¶¶ 289-92, 298-99.)   The public filings on this issue explain that there was a dispute between TierOne and KPMG regarding whether an estimate of reserve needs was provided to KPMG and whether KPMG could issue its audit opinion by a certain date.   (*Id.* ¶¶ 298-300.)   But again, nothing in the public back-and-forth between KPMG and TierOne suggested in a "clear and compelling" way that TierOne was bankrupt.   While KPMG's statements suggest it had lost confidence in the accuracy of TierOne's financial statements, nowhere in KPMG's statements did they suggest that the company was bankrupt or that the stock

18

was "worthless as a matter of fact." *DiFelice,* 397 F. Supp. 2d at 752; *see also WorldCom*, 354

F. Supp. 2d at 449 ("knowledge of a government investigation of a company, including an

investigation into the reliability of its financial statements . . . does not impose a duty of

inquiry.").

Third, the Complaint mentions the May 7, 2010 delisting of TierOne stock, but this event

likewise did not indicate that TierOne stock was worthless. As the Complaint itself concedes,

even after the de-listing, TierOne stock was still being traded over-the-counter on the pink

sheets, so shareholders could still execute trades and could still realize value on their stock

holdings. (Compl., ¶ 297.) Moreover, the Plans expressly contemplated that the TierOne stock

might be traded outside of a public stock exchange, and suggested a method for valuing the

stock. (Ex. C, §  6.2 (ESOP) (p. 32) and Ex. D § 401A (p. 21) (Savings Plan), Evidence Index,

Filing No. 60.

> **c.  Prior Decisions Involving Similar Claims Against Directed**
> **Trustees Demonstrate that the Claim Asserted Here is**
> **Implausible.**

That the events alleged in the Complaint were not sufficient to require PTC to stop

following directions to purchase TierOne stock is underscored by prior decisions involving

similar claims against directed trustees who continued to follow directions to purchase company

stock. Courts evaluating such claims have consistently held that even public pronouncements

predicting an *imminent* bankruptcy – a far more extreme circumstance than anything alleged here

– do not suffice to require a directed trustee to decline to follow instructions to invest in

company stock. For example, in *DiFelice*, the President and CEO of U.S. Airways "informed

investors" in a public conference call that, if the proposed merger with United did not receive

regulatory approval, "there was no 'Plan B' for U.S. Airways," which the court understood

meant that "U.S. Airways would likely seek bankruptcy protection." 397 F. Supp. 2d at 740. After the merger was terminated and after the terrorists attacks of September 11, 2001, the *Wall Street Journal* "identified U.S. Airways as one of the two or three airlines most likely to seek bankruptcy protection in the near future." *Id.* at 741. And in May 2002, the airline "stated [in its SEC filings] that it was contemplating filing for bankruptcy if it were unable to obtain employee concessions and government loans." *Id.* In granting a motion to dismiss the claims asserted against the plan's directed trustee, the court held that *none* of these allegations of express predictions of bankruptcy was "sufficient to have triggered a duty [on the part of the directed trustee] to object to the direction to continue to include the Company Stock Fund as an investment option in the Plan." *Id.* at 755. The court explained that none of these events "signal[led] its [U.S. Air's] imminent collapse," and "Fidelity, as a directed trustee, had no duty to predict the financial fortunes of U.S. Air Group." *Id.* at 755, 756.

A similar, publicly-announced prediction of bankruptcy was held insufficient to trigger a "duty to question" by the directed trustee in *Delphi.* There, Delphi's CEO stated in a *Wall Street Journal* interview that "Delphi would consider bankruptcy if unable to obtain concessions," and that he had established a self-imposed timeframe for deciding whether to file for bankruptcy to ensure that such filing would precede the date by which changes in the bankruptcy laws would take effect. *Delphi*, 602 F. Supp. 2d at 816. Despite these statements by the CEO and subsequent warnings of a possibly imminent bankruptcy filing, the court held that a directed trustee did not breach its fiduciary duties by failing to question the purchase and retention of Delphi stock:

> State Street correctly determined that it needed extraordinary circumstances, such as, in this case, Delphi's imminent bankruptcy, before it could properly override the trust and Plan

20

> provisions which limited its authority with respect to the Company
> Stock Funds.

*Id.* at 828; *accord WorldCom*, 354 F. Supp. 2d at 450 (WorldCom's officer's "speculation" about

company's chances of being sold or going bankrupt "is not reliable public information that either

event would occur, much less reliable information that WorldCom would cease functioning as a

going concern.").

If such predictions of bankruptcy do not suffice to impose a duty to question directions to

invest in company stock, then the much less ominous events preceding TierOne's takeover by

the OTS clearly do not suffice to impose such a duty on PTC.

### d.    The Claims Based On The Alleged Conduct Of The TierOne Defendants Should Also Be Dismissed.

Plaintiffs' failure to state a claim for breach of PTC's limited fiduciary duty necessarily

dooms their claims under the other ERISA provisions they mention in Count I.  As for Plaintiffs'

"co-fiduciary liability" theory, it is well-settled that "[i]f the directed trustee follows 'proper'

directions of the named fiduciary . . . and if those directions are 'in accordance with the terms of

the plan' and 'not contrary to' ERISA under § 403(a)(1), the directed trustee is not liable for a

co-fiduciary's . . . breaches" pursuant to ERISA § 405(a).  *DiFelice*, 397 F. Supp. 2d at 757

(quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 584-85 (S.D.

Tex. 2003)).  The same principle precludes recovery as a matter of law under theories of failure

to remedy a *known* breach, *knowing* participation in a breach, or *enabling* a breach.  *DiFelice*,

397 F. Supp. 2d at 757-58 ("Because the complaint does not allege facts sufficient to find that

Fidelity violated its duties under § 403(a), it failed to allege a violation of either § 405(a)(1) [29

U.S.C. § 1105(a)(1)] or § 405(a)(3) [§ 1105(a)(3)]. . . [or] § 405(a)(2) [§ 1105(a)(2)].");  *accord*

*In re RCN Litig.*, 2006 WL 1273834, at *7-8;  *WorldCom*, 354 F. Supp. 2d at 450-51.  Simply

put, Plaintiffs nowhere allege any facts demonstrating that PTC "knew" that any of the other

TierOne-related defendants were violating their fiduciary duties with respect to the TierOne stock investments, and thus Plaintiffs cannot state a claim against PTC under these other provisions of ERISA.[4]

## III.   THE COURT SHOULD TAKE JUDICIAL NOTICE OF THE PLAN-RELATED DOCUMENTS IN THE INDEX OF EVIDENCE.

The Court may consider the plan-related documents submitted in the accompanying Index of Evidence because they are embraced by Plaintiffs' Complaint.

In deciding a motion to dismiss, the Court may consider not only the complaint, but "documents whose contents are alleged in a complaint," *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003), as well as "materials that are 'necessarily embraced by the pleadings.'" *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citations omitted). Thus, for example, "[i]n a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss." *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

The documents PTC has submitted delineate the duties of PTC and come well within the "embrace" of the Complaint. The Complaint claims that PTC violated its duties under the TierOne ESOP and Savings Plan. Although Plaintiffs do not attach the formal plan documents which set forth those duties, Plaintiffs do quote from and purport to summarize certain matter from the Summary Plan Descriptions, which they do attach to the Complaint. (Compl., ¶ 86; *see id.* at ¶ 87.) Those documents expressly provide that the formal plan documents "govern" the participant's rights and benefits. *See* Compl. Ex. A, Filing No. 57-1, at p. 1 & Ex. B at p. 2. The

---

[4] Of course, if the Court dismisses the claims asserted in Count I against the other defendants, then PTC cannot be derivatively liable for any alleged misconduct of those defendants. PTC accordingly incorporates by reference herein the dismissal arguments made by the other defendants.

formal plan documents submitted in the Index of Evidence are thus clearly embraced by the Complaint.

Indeed, courts addressing claims similar to the ones asserted against PTC have routinely considered on motions to dismiss similar ERISA plan documents which were not attached to the complaint. *See, e.g., In re Gen. Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444, at *7 n.6, 17, 18, 19 (E.D. Mich. Apr. 6, 2006) (court considered "Salaried Plan," "Hourly Plan," "Master Trust Agreement," "Investment Management Agreement," and the plans' prospectuses); *In re RCN Litig.*, 2006 WL 1273834, at *3 n.3 ("Plan's operative document" as well as "Trust Agreement" (the latter which document was attached to the complaint)); *DiFelice*, 397 F. Supp. 2d at 738 n.3 ("Savings Plan" document and "Trust Agreement"); *see also LaLonde*, 369 F.3d at *3 n.5 ("summary plan description, the plan documents, and the trust and service agreements"). As one court in this District summarized in evaluating an ERISA claim:  "In considering a defendant's motion to dismiss, it is proper for the Court to take into account any relevant [ERISA] plan documents."   *Bright v. Conagra Food Inc.*, 8:05cv348, 2006 U.S. Dist. LEXIS 38747, at *6 (D. Neb. June 9, 2006); *accord Fairview Health Servs. v. Ellerbe Becket Co. Employee Med. Plan*, Civil No. 06-2585, 2007 WL 978089, at *3 (D. Minn. Mar. 28, 2007); *Adams v. Gen. Elec. Co.*, No. 06-CV-3303, 2006 WL 2990329, at *2 (W.D. Mo. Oct. 18, 2006); *Halbach v. Great-West Life & Annuity Ins. Co.*, 4:05CV02399, 2006 WL 3206076, at *1 n.4 (E.D. Mo. June 6, 2006).

Further, the documents submitted represent the contracts which govern the scope of PTC's duties and, as demonstrated above, make clear that PTC is a "directed trustee" under ERISA.  Although Plaintiffs allege in their Complaint that the "Trustee" had the ability to "invest assets in any prudent investment which is legally permitted for employee retirement plans"

(Compl., ¶ 86 (bolding and italics omitted)), the actual duties and very limited powers of PTC are set forth in the documents PTC submits with its motion.   Accordingly, "the court may examine the[se] contract documents in deciding [PTC's] motion to dismiss."   *Stahl*, 327 F.3d at 700; *accord Klosek v. Am. Express Co.*, Civ. No. 08-426, 2008 WL 4057534, at *4 (D. Minn. Aug. 26, 2008).

## CONCLUSION

For the foregoing reasons, the Consolidated Complaint should be dismissed with prejudice as against PTC.

Dated:   November 15, 2010

Respectfully submitted,

**DELAWARE   CHARTER   GUARANTEE   & TRUST   COMPANY   D/B/A   PRINCIPAL TRUST COMPANY**

By:   /s Mark F. Enenbach
One of Its Attorneys

Mark F. Enenbach, Nebraska Bar # 15202
Patrick E. Brookhouser, Jr., Nebraska Bar # 19245
MCGRATH NORTH MULLIN
  & KRATZ, PC LL0
First National Tower
Suite 3700
1601 Dodge Street
Omaha, NE  68102
Phone: (402) 341-3070
Fax: (402) 341-0216
menenbach@mcgrathnorth.com
pbrookhouser@mcgrathnorth.com

Joel S. Feldman (admitted *pro hac vice*)
Mark Blocker (admitted *pro hac vice*)
Bruce Braverman (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL  60603
Phone: (312) 853-7000
Fax: (312) 853-7036
jfeldman@sidley.com
mblocker@sidley.com
bbraverman@sidley.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2010, I caused true and correct copies of the foregoing **MEMORANDUM IN SUPPORT OF PRINCIPAL TRUST COMPANY'S MOTION TO DISMISS** to be filed electronically via the CM/ECF system, which will send notification of such filing to following:

**David W. Rowe**
KINSEY ROWE BECKER & KISTLER, LLP
121 South 13th Street
Lincoln, NE  68501-5778

**Jacob A. Goldberg**
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046

**Sandra G. Smith**
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046

**Stephen J. Fearon, Jr.**
SQUITIERI & FEARON, LLP
32 East 57th Street, 12th Floor
New York, NY  10022

**Olga A. Posmyk**
SQUITIERI & FEARON, LLP
32 East 57th Street, 12th Floor
New York, NY  10022

**Joseph Goljan**
SQUITIERI & FEARON, LLP
32 East 57th Street, 12th Floor
New York, NY  10022

**Edward W. Ciolko**
BARROWAY TOPAZ KESSLER
  MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA  19087

**Mark K. Gyandoh**
BARROWAY TOPAZ KESSLER
  MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA  19087

**James K. McCall**
JENNER & BLOCK
353 North Clark
Chicago, IL  60654

**Douglas A. Sondgeroth**
JENNER & BLOCK
353 North Clark
Chicago, IL  60654

**James L. Thompson**
JENNER & BLOCK
353 North Clark
Chicago, IL  60654

**Chelsea Warren**
JENNER& BLOCK
353 North Clark
Chicago, IL  60654

**Gregory C. Scaglione**
KOLEY, JESSEN
1125 South 103rd Street
Suite 800, One Pacific Place
Omaha, NE  68124

**Kathryn E. Jones**
KUTAK, ROCK
1650 Farnam Street
Omaha, NE  68102-2186

**Thomas J. Kenny**
KUTAK, ROCK
1650 Farnam Street
Omaha, NE  68102-2186

**Edward G. Warin**
KUTAK, ROCK
1650 Farnam Street
Omaha, NE  68102-2186

**David A. Yudelson**
KOLEY, JESSEN
1125 South 103rd Street
Suite 800, One Pacific Place
Omaha, NE  68124

**Stephen J. Fearon, Jr.**
SQUITIERI, FEARON
32 East 57th Street
12th Floor
New York, NY  10022

**Joseph Goljan**
SQUITIERI, FEARON
32 E. 57th Street, 12th Floor
New York, NY 10022

**Olga A. Posmyk**
SQUITIERI, FEARON
32 E. 57th Street, 12th Floor
New York, NY 10022

**Richard L. Rice**
CROSBY, GUENZEL
134 South 13th Street, Suite 400
Lincoln, NE  68508

**Mathew T. Watson**
CROSBY, GUENZEL
134 South 13th Street, Suite 400
Lincoln, NE  68508

**Robert H. Berkshire**
BERKSHIRE, BURMEISTER
1301 South 75th Street, Suite 100
Omaha, NE  68124

**Angela M. Boyer**
BERKSHIRE, BURMEISTER
1301 South 75th Street, Suite 100
Omaha, NE  68124

**William C. O'Neil**
WINSTON, STRAWN
35 West Wacker Drive
Chicago, IL  60601

**Timothy J. Rivelli**
WINSTON, STRAWN
35 West Wacker Drive
Chicago, IL  60601

**Edward W. Ciolko**
BARROWAY, TOPAZ
280 King of Prussia Road
Radnor, PA  19087

**Mark K. Gyandoh**
BARROWAY, TOPAZ
280 King of Prussia Road
Radnor, PA  19087

**Matthew A. Lathrop**
LATHROP LAW FIRM
2215 Harney Street
Suite 200, The Accurate Building
Omaha, NE  68102

**Joseph H. Meltzer**
BARROWAY, TOPAZ
280 King of Prussia Road
Radnor, PA  19087

**Joseph A. Weeden**
BARROWAY, TOPAZ
280 King of Prussia Road
Radnor, PA  19087

In addition, I certify that on November 15, 2010 copies of the foregoing document were mailed by United States Postal Service to the following non CM/ECF participants:

**Patricia Young**
962 N. Lakeshore Dr.
Lincoln NE  68528

s/ Mark F. Enenbach
Mark F. Enenbach